IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF OKLAHOMA

MISTY YOUNGBERG, *Individually and as Personal Representative of the Estate of Kristopher Youngberg, deceased*; TIFFANY WALDROP, *Individually and as Guardian of Christopher Waldrop*; CHRISTOPHER WALDROP, *by and through his Guardian Tiffany Waldrop*; SEAN CONNELL; CHRISTIE CONNELL; KEVIN COFFMAN; HEIDI COFFMAN; WILLIAM OVERSHINER; and LAUREN PADGETT,

                                                                     Plaintiffs,

v.                                                                    Case No. 20-339-JWB

GENERAL MOTORS LLC,

                                                                   Defendant.

**MEMORANDUM AND ORDER**

This matter is before the court on a number of pending motions including Defendant's motion for summary judgment (Doc. 144). The other matters on file include various motions in limine or to exclude evidence (Docs. 147, 151, 152, 154-158, 160-164, 167, 168, 211, 224) as well as Plaintiffs' motion for partial summary judgment. (Doc. 166.) For the reasons stated herein, the court concludes that Defendant's motion for summary judgment (Doc. 144) should be GRANTED, and that the remaining motions should be DENIED AS MOOT.

**I. Facts**

Plaintiffs bring product liability and negligence claims arising from a tragic automobile collision. On October 5, 2018, Plaintiff Sean Connell was driving a 2013 model General Motors' (GM) Chevrolet Express 15-Passenger Van (the "2013 GM Van" or "the van") westbound on Interstate 40 near Okemah, Oklahoma. Kristopher Youngberg, Christopher Waldrop, Kevin

Coffman, and William Overshiner were passengers in the van. All of these individuals (referred to collectively as "Plaintiffs") were Nuclear Materials Couriers for the National Nuclear Security Administration (NNSC), an agency within the Department of Energy. Plaintiffs' job duties included transporting nuclear materials within the United States. At the time of the accident, they were returning from a work exercise in Arkansas. When a dump truck traveling on the highway ahead of the van unexpectedly attempted to make a U-turn across the center median, the van slammed into the back of the dump truck.

The 2013 GM Van is a full-size, heavy-duty vehicle categorized as a large passenger van. The 2013 GM Van met or exceeded all applicable Federal Motor Safety Standards. The General Services Administration (GSA) purchased the 2013 GM Van as part of a new fleet of 15-passenger vans on February 19, 2013. The 2013 GM Van was manufactured and delivered two months later. When GSA purchases a vehicle, it provides a bid sheet with the specifications it wants for the vehicle. GM did not offer Forward Collision Warning (FCW) [also referred to as Forward Collision Alert (FCA)] or Automatic Emergency Braking (AEB) systems on the 2013 Model GM Van and GSA did not specify that it wanted such systems.

Plaintiffs routinely used such vans as the 2013 GM Van as escort vehicles on missions and as passenger transport vehicles. They received detailed specific training on use of such vans. At the time of the accident, it was daylight and clear and the road surface was dry. Mr. Connell was driving westbound on Interstate 40 when he encountered a construction zone, where the speed limit was reduced from 70 to 55 miles per hour. All westbound traffic was shifted to the left, inside lane in the construction zone. Daniel Forbus, who was driving a fully-loaded, 58,500-pound dump truck, was two vehicles ahead of Connell in the construction zone. As the construction cones ended and the right lane reopened, Connell saw the dump truck move to the right lane and straddle

the right fog line, with half of the truck in the right lane and half on the right shoulder. Connell remained in the left lane. Connell saw the two vehicles ahead of him pass the dump truck on its left. As Connell moved to pass the dump truck, he saw it move to the left lane, almost perpendicular to the roadway, as it attempted to make an illegal U-turn through the median. Connell slammed on the brakes and swerved to the right but was unable to avoid the collision, slamming into the rear of the dump truck. The van caught fire within seconds. Kristopher Youngberg was killed as a result of the collision. The other passengers in the van suffered various injuries. Plaintiffs were all extricated from the van and received roadside treatment from Good Samaritans and first responders.

The Oklahoma Highway Patrol and the NNSA investigated the accident. The Highway Patrol and NNSA determined that the dump truck driver was at fault due to an unsafe lane change. The driver of the dump truck was charged with negligent homicide (misdemeanor) and incarcerated. The NNSA also concluded that the van was traveling between 75-80 miles per hour (20-25 mph over the speed limit) prior to the evasive actions, and that unauthorized munitions in the van (including two smoke grenades) contributed to the rapid spread of the fire.

Forward Collision Warning (FCW) is a system designed to provide a visual, audible, or haptic (sensory) alert to the driver when the system determines the driver is approaching a vehicle directly ahead too quickly. It is a warning-only system and does not activate brakes or assist braking. Automatic Emergency Braking (AEB) is an umbrella term for systems that may automatically apply braking if the system (1) detects a vehicle directly in front traveling the same direction and (2) predicts a possible front-end collision.

GM built a self-driving car in 1956. In 1969 it built a car with radar crash avoidance – the "Cadillac Cyclone XP." These cars were never developed for mass production or sale. GM worked on developing collision avoidance systems in the 1980s.

GM was aware in the 1990s and thereafter that motor vehicle crashes in the United States resulted in tens of thousands of deaths annually, millions of injuries, and billions of dollars in economic losses. It was aware that rear-end crashes accounted for approximately 25% of all police-reported crashes and 5% of all traffic deaths, and that the NHTSA reported in 1996 that over 1.5 million rear-end crashes could be addressed by FCW and estimated that 791,000 crashes could be prevented or mitigated. GM's subsidiary, Delphi, was doing research for GM in 1998 on FCW and Collision Avoidance Systems. GM knew in 1998 that NHTSA projected that such systems could theoretically prevent 37 to 74 percent of all reported rear-end crashes. In 2001, GM was aware that rear-end collisions were often caused by driver inattention or distraction, which increase response time to potential collisions.

In 2002, the NTSB sent a safety recommendation to the Presidents of Ford and GM asking them to equip Electronic Stability Control (ESC) systems on their 15-passenger vans to reduce the risk of rollover accidents. In 2003, GM introduced standard anti-lock brake systems on its 15-passenger vans, and in 2004 it introduced ESC on its 15-passenger vans that had "the ability to apply the vehicle's brakes independent of whether the driver is using the brake pedal" to avoid oversteer and understeer that can cause rollover accidents.

In 2004, GM introduced Adaptive Cruise Control (ACC) with long-range radar on its Cadillac XLR two-door passenger car. The radar system was manufactured by Continental. The system had a FCW feature when the ACC was turned on and was actively set on a speed. (Doc. 177-1 at 31.) The ACC provided some braking and some acceleration to maintain a set distance

4

with a vehicle in front detected by radar, and if the system determined that the breaking required to maintain that distance was greater than what the system could provide, it would give a warning to the driver.  (*Id*.)  In 2005, GM offered a radar-based ACC for the Cadillac STS, and for 2006 it was offered on the Cadillac DTS.  On the 2005 STS, the FCW feature was available when the ACC system was turned on even if the ACC was not actively set on a speed. (*Id*. at 34.)

GM offered its first camera-based FCW system as an option on two 2012 model year vehicles – the Chevrolet Equinox and GMC Terrain.  Like other vehicle manufacturers, GM initially offered a targeted rollout of the technology in part because it was uncertain about its field performance and wanted to evaluate real-world capabilities and ensure customer acceptance of the feature.  This FCW system was the first camera-based collision alert system by any manufacturer.

GM offered its first AEB system, along with FCW, one year later, on its 2013 Cadillac SRX, ATS, and XTS.  These 2013 models used a "fusion-based" system that included a camera sensor, a long-range radar, a short-range radar, and a calculation module.  (Doc. 177-1 at 53-54.)

GM was responsible for deciding whether to equip the 2013 GM Van with FCW or AEB systems. GM has a process for rolling out safety systems, such as FCW and AEB, that evaluates the safety risks and development of designs to mitigate the risks.

No heavy-duty van in the world offered FCW or AEB in 2013.  In 2013, less than 6% of all passenger vehicles in the United States were equipped with FCW and less than 3% of all passenger vehicles were equipped with AEB.

Plaintiffs claim GM is liable to them under Oklahoma law based on theories of product liability and negligence.  They allege that the 2013 GM Van was defective and unreasonably dangerous because it was not designed to avoid foreseeable frontal crashes with its brake and safety systems, it was not equipped with FCW or AEB systems to avoid or mitigate collisions, and

because GM did not adequately warn or instruct consumers about the hazards associated with operating the van without the foregoing systems. Plaintiffs also claim GM had "a duty to exercise ordinary care in the research, development, specification, design, approval, manufacture, testing, marketing, distribution, monitoring and recall" of the 2013 GM Van to ensure it was not defective, that it knew or in the exercise of ordinary care should have known the vehicle was defective and unreasonably dangerous, and that GM breached its duty of care in various ways, including by "failing to use technologically and economically feasible" systems including FCW, ACC, and AEB systems. (Doc. 87 at 14-16.)

## II. Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Sotunde v. Safeway, Inc.*, 716 F. App'x 758, 761 (10th Cir. 2017). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). If the movant carries the initial burden, the nonmovant must then assert that a material fact is genuinely disputed and must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored, information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; by "showing that the materials cited [in the movant's motion] do not establish the absence ... of a genuine dispute"; or by "showing that an adverse party [i.e., the movant] cannot produce admissible evidence to support

6

the fact." Fed. R. Civ. P. 56(c)(1); *see also Celotex Corp.*, 477 U.S. 317. Also, the court will only consider facts based on personal knowledge or supported by exhibits. Conclusory allegations are not sufficient to create a dispute as to an issue of material fact. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

### III. Analysis

#### A. Product Liability Claim

Oklahoma adopted the theory of manufacturers' products liability in *Kirkland v. General Motors Corp.*, 521 P.2d 1353 (Okla. 1974), which "teaches that one who sells a product in a defective condition, which is unreasonably dangerous to the user or consumer, is strictly liable for the physical harm to the person or property caused by the defect." *Johnson v. Ford Motor* Co., 45 P.3d 86, 91 (Okla. 2002). A plaintiff suing a manufacturer under a strict products liability theory must establish: "(1) that the product caused plaintiff's injury; (2) that the defect existed in the product at the time of sale or at the time it left the [manufacturer's] possession and control; and (3) that the defect made the product unreasonably dangerous." *Wheeler v. HO Sports Inc.*, 232 F.3d 754, 756 (10th Cir. 2000) (citing *Kirkland*, 521 P.2d at 1353). "The plaintiff carries the burden of proof on each of these elements." *AlNahhas v. Robert Bosch Tool Corp.*, 706 F. App'x 920, 931 (10th Cir. 2017) (quoting *Dutsch v. Sea Ray Boats, Inc.*, 845 P.2d 187, 190 (Okla. 1992) (citation omitted)).

The defect "may be the result of a problem in the product's design or manufacture, or it may be the result of inadequate warnings regarding use of the product." *Wheeler*, 232 F.3d at 757 (internal quotation marks omitted). "The article sold must be dangerous to an extent beyond that

which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Kirkland*, 521 P.2d at 1362-63 (quoting Restatement (Second) of Torts § 402A cmt. g (1965)). "The Oklahoma Supreme Court has defined the 'ordinary consumer' as 'one who would be foreseeably expected to purchase the product involved.'" *McClain v. Brainerd Chem. Co., Inc.*, 436 P.3d 752, 757 (Okla. Civ. App. 2019) (citing *Woods v. Fruehauf Trailer Corp.*, 765 P.2d 770, 774 (Okla. 1988)).

Under these standards, Plaintiffs have failed to cite evidence sufficient for a jury to find that the 2013 GM Van was unreasonably dangerous at the time it left GM's possession. Plaintiffs' evidence suggests it may have been technologically feasible by 2013 for GM to equip a vehicle like the van with FCW and AEB systems. But "[a]s explained by Oklahoma courts, merely because a product could be made 'safer' does not mean it posed an unreasonable danger to the ordinary consumer who used it." *Braswell v. Cincinnati Inc.*, 731 F.3d 1081, 1087 (10th Cir. 2013) (citing *Woods,* 765 P.2d at 775). To the extent the record contains evidence about consumer expectations, it fails to support the allegation that the van's characteristics made it dangerous to an extent beyond the contemplation of an ordinary user. Any ordinary user would have understood that operating this vehicle at highway speeds entailed a potential danger of front-end collisions with objects – including stopped or slowing automobiles – in the vehicle's path. *Cf. Lamke v. Futorian Corp.*, 709 P.2d 684, 687 (Okla. 1985) ("It is common knowledge a lighted cigarette is potentially dangerous.") Moreover, it would have been almost universally understood by a user in 2013 that safe operation of the van was entirely dependent – or almost entirely – upon the driver's vigilance and use of the vehicle's braking and other systems. A driver's responsibility for avoiding collisions by limiting speed, braking, and steering has been an inherent and well-understood characteristic of automobile operation for over a century. An ordinary user of a van in

2013 would have understood the extent of the danger posed by collisions with other vehicles on the roadway and would have understood how the operator could use the vehicle's systems to avoid collisions. Against that background, Plaintiff cites no evidence that a significant shift in consumer expectations or reliance upon automated warning or braking systems had taken place by 2013 or that the danger posed by operating the 2013 van was otherwise beyond the contemplation of ordinary users. *Cf. Brown v. Linear, LLC*, No. CIV-15-280-R, 2016 WL 879333, *3 (W.D. Okla. Mar. 7, 2016) (finding no evidence that an ordinary purchaser of a land-line based medical alert unit would have expected it to have backup cellular capability, although an expert testified such technology was available at that time); *Braswell,* 731 F.3d at 1089 (an ordinary user of a brake press would be aware of the extreme danger of reaching into the press with the operator's foot on a switch that activates the press). On the contrary, the evidence shows that in 2013, less than 6% of all passenger vehicles in the United States were equipped with FCW and less than 3% of all passenger vehicles were equipped with AEB. These minimal numbers do not support an inference that an ordinary consumer in 2013 would have expected the van to have automated emergency braking or collision warning systems, or that the danger of operating the van without such systems was more extensive than what a consumer would contemplate, given that a consumer would have expected the van's safe operation to be entirely dependent upon the driver's vigilance and use of manual systems.

      Neil Hannemann, Plaintiffs' automotive engineering expert, opined that the 2013 van was defective because it was not equipped with an FCW or AEB system. (Doc. 144-18 at 3-4.) He also stated in his deposition that an ordinary user would not understand "how quick an accident can progress" and "people that drive a 15-passenger van don't always realize how much weight they're adding … if they've got the van fully loaded." (Doc. 144-17 at 4.) He made clear,

9

however, that he was not saying an ordinary consumer in 2013 expected a vehicle to automatically brake or to provide advance warning of a collision. (*Id.* at 3-4.) At the same time, Hannemann made clear that he believed the van was unreasonably dangerous because "[s]afe alternative designs for [FCW and AEB] systems were feasible for 2013 model year vehicles" and it "was technologically and economically feasible" for GM to have equipped the van with such systems. (*Id.*)

As the Tenth Circuit noted in *Braswell*, the "consumer expectations test" adopted by the Oklahoma Supreme Court is distinct from the "risk-utility test." *Id.* at 1088. The latter test identifies unreasonably dangerous products (in part) by assessing whether feasible alternative designs exist that could have prevented the injuries. *Id.* But "there is no sign that Oklahoma has backed away from the consumer expectation test," and that test therefore governs a product liability action under Oklahoma law. *Id.* at 1089. *See also AlNahhas v. Robert Bosch Tool Corp.*, 706 F. App'x 920, 930 (10th Cir. 2017) ("Because Oklahoma has just one test for whether a product is unreasonably dangerous – the consumer expectations test – most cases treat design defects and inadequate warnings as merely different methods of proof for the same products liability claim.") (quoting *Braswell*, 731 F.3d at 1092 n.3.) Mr. Hannemann's opinion that the van was unreasonably dangerous was based primarily – if not exclusively – on his assessment that GM could have feasibly adopted alternative van designs that incorporated FCW and AEB systems.[1] But under Oklahoma law, the fact that such designs existed is insufficient to support a finding that this product was unreasonably dangerous. And to the extent Hannemann made some passing

---

[1] Although Plaintiffs cited GM's 2013 Cadillac SRX as an example of GM's ability to equip vehicles with FCW and AEB systems in 2013, Hannemann opined that the FCW used on GM's 2013 Cadillac SRX was "not capable of providing the performance required for Sean Connell to have avoided the dump truck in this collision." Instead, he offered that GM "could have reconfigured and recalibrated the system … in order to have improved the performance for highway speeds." (Doc. 144-18 at 4.)

10

references to consumer expectations – *i.e.*, opining that users do not appreciate how quickly accidents happen and "don't always" realize the weight of a fully-loaded van – his opinion fails to show a genuine issue for trial. Aside from the fact that neither of the foregoing opinions was quantified or tied to the specific circumstances of the accident, Plaintiffs cite no factual support for the assertion that these characteristics presented dangers beyond the contemplation of ordinary van users. It is undoubtedly true that drivers could underestimate the reaction time or stopping distance required to safely avoid a frontal collision, particularly at highway speeds, but the same could be said of virtually any motor vehicle. Moreover, these characteristics were not latent – they were open and obvious – and a user with "the ordinary knowledge common to the community as to [the van's] characteristics" would have been aware of the dangers and how to avoid them through management of the van's speed, braking, and steering. *Kirkland*, 521 P.2d at 1362-63.

Plaintiffs deny that they are claiming the van is defective "merely because it could be made safer" and argue that GM misstates the nature of the consumer expectations test. (Doc. 175 at 2.) Plaintiffs also fault GM for failing to cite testimony about consumer expectations and assert that "[t]here is ample evidence from which the jury could infer that this vehicle was unreasonably dangerous." (*Id.* at 21.) But Plaintiffs' brief is itself void of evidence from which a jury could reasonably find the van's characteristics were dangerous to a degree beyond which an ordinary van user would have contemplated. (*See id*. at 14-18.) That failure to support an essential element of the claim means Defendant is entitled to summary judgment on the claim. The grant of summary judgment extends as well insofar as Plaintiffs claim the van was defective because Defendant failed to adequately warn of its allegedly dangerous characteristics. As stated previously, the danger from potential frontal collisions would have been apparent to an ordinary user in 2013. "There is no duty on a manufacturer or seller to warn of a product-connected danger which is obvious or

generally known….." *Braswell*, 731 F.3d at 1090 (citing *Duane v. Okla. Gas & Elec. Co.*, 833 P.2d 284, 286 (Okla. 1992)). *See also Ahrens v. Ford. Motor Co.*, 340 F.3d 1142, 1146-47 (10th Cir. 2003) (finding the danger of falling off a tractor made without a seat belt was open and obvious; "[t]he duty to warn is only implicated where the manufacturer has no reason to expect ordinary users to discover the danger involved.")  As such, Defendant is entitled to summary judgment on Plaintiffs' product liability claim.

**B. Negligence Claim**

Defendant contends the failure to cite evidence sufficient to show a defect in the 2013 van is fatal to Plaintiffs' claim of negligence as well.  (Doc. 144 at 14.)  The court agrees.  Plaintiffs' allegations of negligence are premised on Defendant's duties with respect to a product that is allegedly defective and unreasonably dangerous.  Those allegations include failures by GM to exercise ordinary care to design, test, and monitor the 2013 van "to ensure that it was not defective;" failures by GM to provide information to the NHTSA and warnings to customers after discovery of a defect; and failure to recall, retrofit, and issue warnings after discovery of a defect.  (Doc. 87 at 16-17.)  Although the doctrine of strict liability under Oklahoma law does not necessarily subsume entirely all claims for negligence against a manufacturer, in this instance Plaintiffs' negligence claims are based entirely on GM's alleged legal duties with respect to a defect in the 2013 van, such that a showing of a defect is an essential component of the negligence claims.  Inasmuch as Plaintiffs have failed to cite evidence on which a jury could reasonably find that the 2013 van was defective within the meaning of Oklahoma law, Plaintiffs' negligence claim necessarily fails as a matter of law.[2]  *Cf. Kirkland*, 521 P.2d at 1366 ("Although the theory of

---

[2] The same is true with respect to Plaintiffs' claim for punitive damages, which is dependent upon Plaintiffs' other claims.  *See CapLOC, LLC v. Carrington*, No. CIV-19-715-SLP, 2020 WL 12772272, at *9 (W.D. Okla. June 16, 2020) ("Punitive damages are not an independent cause of action, but a form of relief dependent on [a] [p]laintiff's other claims.") (citation omitted.)

manufacturers' [strict] products liability … would not repudiate or be so repugnant to a cause of action for a defective product based on negligence as to necessitate an election of remedies," it does include "a defect cause by some form of negligence," and a negligence action "may thus be rendered unnecessary.")

### C. Remaining motions

The court has reviewed the remaining motions on file, including the parties' various motions in limine or to exclude evidence (Docs. 147, 151, 152, 154-158, 160-164, 167, 168, 211, 224) as well as Plaintiffs' motion for partial summary judgment. (Doc. 166.) In view of the court's conclusion above that GM is entitled to judgment as a matter of law under the uncontroverted facts, the court finds that the remaining motions on file should be denied as moot.

### IV. Conclusion

Defendant's motion for summary judgment (Doc. 144) is GRANTED. Plaintiffs' claims are dismissed on the merits, with Plaintiffs to take nothing on their claims. The remaining motions in the case, including Docs. 147, 151, 152, 154-158, 160-164, 166-168, 211, and 224, are DENIED AS MOOT. The clerk is directed to enter judgment accordingly.

IT IS SO ORDERED this 24th day of August, 2022.

       s/ John W. Broomes       
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE